## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| **COMMODITY FUTURES** | ) | |
| **TRADING COMMISSION** | ) | **Case No. 25-13727** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **COMPLAINT FOR INJUNCTIVE** |
| **v.** | ) | **AND OTHER EQUITABLE** |
| | ) | **RELIEF AND** |
| **BRIAN MITCHELL,** | ) | **FOR CIVIL MONETARY** |
| **KEVIN MACK, Jr.,** | ) | **PENALTIES UNDER THE** |
| **and YOUNG PROS INVESTMENT** | ) | **COMMODITY EXCHANGE ACT** |
| **GROUP LLC** | ) | **AND COMMISSION** |
| | ) | **REGULATIONS** |
| **Defendants.** | ) | |
| _____ | ) | **JURY TRIAL DEMANDED** |

Plaintiff, Commodity Futures Trading Commission ("Commission" or "CFTC"), by and through its undersigned attorneys, hereby alleges as follows:

### I.     SUMMARY

1.     From on or about December 2020 through on or about May 2022 (the "Relevant Period"), Defendants Brian Mitchell ("Mitchell") and Kevin Mack, Jr. ("Mack"), individually and as controlling persons of Young Pros Investment Group LLC ("YPIG") (collectively, "Defendants"), fraudulently solicited and accepted approximately $1 million from approximately 33 members of the general public ("pool participants") to participate in a commodity pool operated by YPIG

("commodity pool" or "Pool").  The commodity pool was controlled by Defendants Mitchell and Mack and used pool funds to trade commodity futures contracts, including the e-mini S&P 500 and micro S&P futures contracts. Defendants' fraudulent solicitation practices included: (i) claiming that Mitchell was a successful trader; (ii) guaranteeing positive monthly returns; (iii) guaranteeing pool participants' principal contribution against loss; and (iv) failing to disclose to pool participants the risk of incurring losses when trading commodity futures contracts.

2.      Contrary to Defendants' representations, neither Mitchell nor Mack were successful traders.  In fact, during the Relevant Period, Defendants' trading on behalf of pool participants resulted in losses in the majority of months that they traded.  Of the approximately $1 million traded on behalf of pool participants, Defendants lost over $750,000.

3.      Despite losing money nearly every month they traded, Defendants continued to solicit new pool participants for the Pool with promises of successful trading and guaranteed profits.  Moreover, in furtherance of their fraudulent scheme, Defendants attempted to conceal their trading losses by: (i) providing false monthly account statements to pool participants; and (2) using the principal deposits of newer pool participants to pay purported "profits" or "returns" to previously established pool participants -- in the manner of a Ponzi-scheme.

4.      Throughout the Relevant period, YPIG acted as a commodity pool operator ("CPO") without being registered with the CFTC, as required by the Commodity Exchange Act ("Act").  By soliciting investments on behalf of YPIG, Defendants Mitchell and Mack acted as associated persons ("APs") of CPO YPIG without being registered with the CFTC, as required by the Act.

5.      Defendants also commingled pool participants' funds with the Defendants' personal funds, failed to receive pool funds into an account in the name of the Pool, and failed to provide pool disclosure documents and pool statements as required by Commission Regulations.

6.      Defendants used the mails or instrumentalities of interstate commerce in their solicitation of investors, including emails, text messages, and interstate wire transfers.

7.      By virtue of this conduct and the conduct further described herein, Defendants have engaged in acts and practices in violation of anti-fraud Sections 4b(a)(1)(A)-(C), and 4$o$(1)(A)-(B) of the Act, 7 U.S.C. §§ 6b(a)(1)(A)-(C), and 6$o$(1)(A)-(B), and Commission Regulation ("Regulation") 4.20(a)(1), (b) and (c), 17 C.F.R. § 4.20(a)(1), (b) and (c) (2024), which prohibits a CPO from failing to operate a commodity pool as a separate legal entity, failing to receive funds in the pool's name, and from commingling property of a pool it operates or intends to operate with property of another person.

8.     In addition to the above-described fraudulent conduct, Defendant YPIG made use of the mails or any means or instrumentality of interstate commerce and acted at all times during the Relevant Period as a CPO by soliciting, accepting and/or receiving funds for a commodity pool without being registered with the Commission as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1).

9.     Similarly, Defendants Mack and Mitchell solicited funds for participation in a commodity pool for the purpose of trading commodity futures, while associated with Defendant YPIG as officers, employees, or agents, without being registered with the Commission as APs of YPIG, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2024).

10.    The acts and omissions described herein have all been done by Mitchell and Mack in the scope of their employment or office at YPIG during the Relevant Period.  Therefore, YPIG is liable for all acts and omissions described herein by Mitchell and Mack, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2024).

11.    Mitchell and Mack are controlling persons of YPIG and did not act in good faith or knowingly induced YPIG's violations of the Act and Regulations described herein during the Relevant Period.  Therefore, Mitchell and Mack are

liable for YPIG's violations of the Act and Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b).

12.    This was not the first time that Defendant Mitchell violated the Act. In September 2021, the Commission instituted administrative proceedings against Mitchell, issuing an order (the "2021 Order") finding that Mitchell had failed to register as a commodity trading advisor ("CTA") despite holding himself out as a CTA to friends and acquaintances and furnishing commodity trading advice to more than fifteen persons.

13.    Defendant Mitchell agreed to settle the matter simultaneously with the Commission's filing and consented to the entry of the 2021 Order, which found that Defendant Mitchell violated Section 4m(l) of the Act, 7 U.S.C.§ 6m(1) (2024).

14.    As part of the settlement, Defendant Mitchell was ordered to cease and desist from further violations of Section 4m(1), to pay a civil monetary penalty in the amount of $150,000, and was prohibited from, directly or indirectly, engaging in trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. §1a(40) (2024)) or applying for registration or claim exemption from registration with the Commission in any capacity for a period of at least three years after the date of entry of the 2021 Order.

15.    In disregard of the 2021 Order, from September 2021 through at least
May 2022, Defendant Mitchell solicited funds for the purpose of purchasing and
selling commodity interests, directed the trading of accounts involving
commodity interests, and acted as an agent for a CPO.

16.    Accordingly, pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1
(2024), the CFTC brings this action to enjoin the unlawful acts and practices of
Defendants and to compel their compliance with the Act and the Regulations.  In
addition, the CFTC seeks civil monetary penalties and remedial ancillary relief,
including, but not limited to, trading and registration bans, restitution,
disgorgement, rescission, pre- and post-judgment interest, and such other and
further relief as the Court deems necessary and appropriate.

17.    Unless enjoined by this Court, Defendants are likely to continue to
engage in the acts and practices alleged in this Complaint, as more fully described
below.

## II.    JURISDICTION AND VENUE

18.    This Court possesses jurisdiction over this action pursuant to 28
U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345
(providing that U.S. district courts have original jurisdiction over civil actions
commenced by the United States or by any agency expressly authorized to sue by
act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a),

provides that U.S. district courts possess jurisdiction to hear actions brought by the CFTC for injunctive relief or to enforce compliance with the Act whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

19.     Venue lies properly with this Court pursuant to 7 U.S.C. § 13a-1(e) because Defendants resided and/or transacted business in this District, and certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

### III.     THE PARTIES

20.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1-26, and the Regulations promulgated thereunder, 17 C.F.R. pts. 1–190 (2024).

21.     Defendant **Brian Mitchell** is a resident of Michigan with a last known address in Washtenaw County, Michigan.  Throughout the Relevant Period, Mitchell held himself out as a partner and trader of YPIG.  Prior to the Relevant Period, Mitchell was registered with the Commission as an AP of a firm which was a registered Commodity Trading Advisor.  Mitchell was also an associate member of the National Futures Association ("NFA") and held principal status for that

Commodity Trading Advisor from 2015-2016, however, in November 2017 the NFA's Business Conduct Committee entered a two-year bar against Mitchell and barred him from holding principal status and associate membership at any registered firm.  On September 22, 2021, the Commission entered into a consent order with Mitchell.  The order imposed a 3-year ban on Mitchell from trading on or subject to the rules of any Commission registered entity, and from engaging in any activities requiring Commission registration.

22.     Defendant **Kevin Mack Jr.** is a resident of Maryland.  Throughout the Relevant Period, Mack held himself out as a registered agent, partner and trader of YPIG.  Mack has never been registered with the Commission in any capacity.

23.     Defendant **Young Pros Investment Group LLC** is a limited liability company organized in the State of Michigan on January 21, 2021.  YPIG's address is located in Washtenaw County, Michigan.  Mack is the registered agent of YPIG. YPIG has never been registered with the Commission in any capacity.

## IV.   FACTS

### A.   Commodity Pool Fraud

24.     During the Relevant Period, Mitchell and Mack, individually and through YPIG, fraudulently solicited approximately $1 million from approximately 33 individuals to invest in a commodity pool to trade commodity futures contracts.

25.     Mitchell and Mack incorporated YPIG on January 21, 2021, in the

State of Michigan and listed themselves as registered agents. The Defendants, however, had started soliciting pool participants and trading commodities prior to incorporating YPIG.

26. During the Relevant Period, Defendants fraudulently solicited prospective pool participants by word of mouth, in person meetings, email, and text messages.

27. In their solicitations of prospective pool participants, Defendants claimed that Mitchell was a successful and experienced trader.

28. Based on Mitchell's purported trading abilities, Defendants guaranteed prospective pool participants a fixed monthly return based on the amount in their account.

29. Defendants provided prospective pool participants with a YPIG contract that contained the statement: "I understand that the investment plan will earn a fixed percentage every month. My earnings percentage will increase based on my investment balance."

30. Underneath this statement in the YPIG contract, Defendants listed the fixed return percentages for the various account balances in their "5 Levels of Earnings." The five levels of earnings were as follows:

- 6% on $2,000+ invested
- 7% on $5,000+ invested
- 8% on $10,000+ invested
- 9% on $25,000+ invested

- 10% on $50,000+ invested

31.     Defendants Mack and Mitchell also told prospective pool participants that their principal contribution to the pool was guaranteed against loss.

32.     Specifically, the YPIG contract states "my principle [sic] investment is **100% guaranteed** by Young Pros Investment Group LLC…." (Emphasis in original).

33.     Additionally, the YPIG contract states that "Terms and conditions may change, but my principle [sic] investment will remain guaranteed and insured by Young Pros Investment Group LLC to provide **100% protection in all matters under their control**." (Emphasis in original).

34.     Defendant Mack told at least one pool participant in an email that YPIG was in "full compliance" and met certain "exemption criteria" because Defendants only worked with family and friends, did not give financial advice or publicly advertise and did not charge a fee for their service.  Mack further explained that "[p]ublic registration is not a requirement to invest for friends and family, and it does not impact our ability to earn returns for the group."  This statement was not true because it did not accurately describe the pool participants or the activities of the pool.  Additionally, Defendant Mitchell, pursuant to the 2021 Order, was prohibited from engaging in any activity that requires Commission registration, or is exempt from registration.

35.     When this same pool participant asked about the safety of their contribution to the pool, Mack wrote: "Since you joined before we hit our first million, we guarantee your principal investment by matching each dollar in a seperate [sic] account. People who join later do not get the same guarantee, but we have never missed a payment up to this point and continue to grow."

36.     Defendants did not disclose the risks of incurring losses when trading commodity futures to prospective pool participants.

37.     In the YPIG contract, Defendants claimed that pool participants could withdraw 50% of their initial contribution to the pool "at any time within the second month," 75% of their initial contribution to the pool "at any time within the third month," and 100% of their initial contribution to the pool "at any time after the third month."

38.     The YPIG contract also stated that upon request, pool participant funds "will be returned to you within 7 business days."

39.     Defendants also provided prospective pool participants with a document labeled "Funding Options" that included instructions on how to transfer money to YPIG.

40.     For wire transfers, prospective pool participants were initially given instructions to route funds directly to a bank account held in the name of Defendant Mack and later to a YPIG account.

41.     In this "Funding Options" document, prospective pool participants were also given instructions for sending money via PayPal, Zelle, and Cash App.

42.      For PayPal and Zelle, Defendants provided prospective pool participants with directions on how to search for Defendants Mack and Mitchell's personal accounts.

43.     For Cash App, Defendants provided prospective pool participants with directions on how to search for Defendant Mack's personal account.

44.     Defendant Mack told at least one pool participant that despite the fact that Defendants were using Mack's personal account to collect pool contributions, pool participant funds did not mix with any of his personal funds.

45.     Based on Defendant Mitchell's purported trading results, the fixed monthly return promise and the fact the YPIG guaranteed each pool participant's principal many of the prospective pool participants became convinced of Mitchell's success as a trader and decided to send money to the Defendants.

46.     Prospective pool participants wired or deposited funds totaling approximately $1 million into bank or payment accounts held in the name of Mack, Mitchell or YPIG.

47.     Defendants did not maintain any trading accounts specifically in the name of, or on behalf of, the Pool.

48.     Instead, Defendants wired approximately $1 million to commodity trading accounts held in either Mack's name, or Mack's girlfriend's name, at a registered futures commission merchant ("FCM").

49.     Even though the commodity trading accounts were not in Mitchell's name, Mack gave Mitchell access to the commodity trading accounts in order to conduct trading on behalf of the Pool.

50.     During the Relevant Period, Defendants provided monthly account statements to at least two pool participants which purported to show that their accounts had increased in value.

51.     On July 12, 2021, Defendants sent pool participants an email that purported to contain "Important Updates" concerning the Pool's performance.

52.     The July 12th email began by informing pool participants that YPIG had "continued to grow incredibly fast and ha[d] reached a pivotal milestone of over $2,000,000 in working capital!"

53.     Defendants further claimed that "[w]e now have over 70 clients who we collectively pay over $180,000 per month through re-investments or payouts!"

54.     Defendants also encouraged pool participants to take advantage of YPIG's "earning reinvestment option" to achieve "maximum compounded growth."

55.     Defendants also reminded pool participants that YPIG offered referral bonuses of 5%, up to $1000, for any pool participant who secured any new pool participants.

56.     As late as November 1, 2021, at least one pool participant received a YPIG account statement that purported to show that YPIG was still making earnings payments to pool participants.

57.     After a period of substantial losses, Mack became the lead trader for the Pool and made all strategic decisions regarding the Pool's funds.

58.     On December 4, 2021, Mitchell sent pool participants an email with a subject line of "YPIG Account Status Clarification."

59.     Mitchell began his message by addressing the fact that pool participants had been told that YPIG was permanently closed due to a pending court action against Mitchell, and as a result, YPIG could no longer continue as a business.

60.     Mitchell went on to write that, while there was no pending legal action against him, YPIG was indeed closed because "[w]e crashed and burned. Kevin and I lost the money in the market with me losing the bulk of it."

61.     Mitchell fraudulently explained that, despite the fact the Defendants had guaranteed the pool participants' initial pool contributions, that money was gone because the CFTC had seized his assets, supposedly over $800,000.

62.     Mitchell wrote that "that seized money was the back up money to cover YPIG in case we crashed and burned. I [Mitchell] had offered up my own money as a safety net for YPIG investors [pool participants].  That $800k would not have covered half of the deposits but it sure would have helped us rebound out of the hole."

63.     Mitchell lied to pool participants about why he could not honor the Defendants' guarantee of repayment. While it is true that as part of the 2021 Order, Mitchell was required to pay a $150,000 civil monetary penalty, the CFTC did not, however, seize Mitchell's assets to satisfy the imposed civil monetary penalty.

64.     Lastly, Mitchell claimed that he was working on a plan to secure capital to start growing the account again in order to pay back all the investors.  He wrote, "[w]hile I do understand and empathize heavily with every single situation with all investors, the fact still remains that we have no money. All I can do at this point is secure what is needed to

grow everything back. So that is what I'm focused on."

65.     Mitchell emailed pool participants on January 9, 2022, claiming that he was still working to recover their funds and had created "4 Categories of Recovery" for pool participants to determine how they would like to be paid back.

66.     Mitchell emailed pool participants again in May 2022 to inform them that he was halting his recovery plan, despite the fact that he was allegedly making

progress, because a pool participant had filed a complaint against YPIG with the Maryland Attorney General's Office.

67.     In total, Mack and Mitchell lost over $750,000 trading commodity futures contracts on behalf of the Pool.  Specifically, in the commodity trading account in Mack's name, Defendants lost money in 6 of the 9 months they traded. In the second commodity trading account, which was in Mack's girlfriend's name, Defendants lost money in 8 of the 10 months they traded.

68.     Defendant Mack used approximately $170,000 of Pool funds from his personal bank account as well as his Square, Venmo, and Zelle P2P accounts, to make payments to existing pool participants to continue the ruse that the Pool was earning profits from trading, thus operating a Ponzi scheme.

**B.     Violation of a Commission Order**

69.     In September 2021, the Commission entered an order finding that between January 2018 and January 2019, Defendant Mitchell directed the commodity futures trading, generally e-mini futures contracts, in over twenty client accounts and was not registered as a CTA.

70.     Under the terms of the 2021 Order, Defendant Mitchell was prohibited from, directly or indirectly:

- Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests; and

- Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests.

71.     Additionally Defendant Mitchell was prohibited from acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2024)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9) (2024).

72.     From September 2021 through May 2022, Defendant Mitchell violated the 2021 Order, by trading commodity accounts on behalf of others and soliciting and receiving funds from others for the purpose of trading commodity interests.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT
## AND COMMISSION REGULATIONS

### COUNT ONE – AGAINST ALL DEFENDANTS

**Violations of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C)
(Fraud in Connection with Futures)**

73.    Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

74.    Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C), makes it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person
>
> (A)    to cheat or defraud or attempt to cheat or defraud the other person;
>
> (B)    willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;
>
> (C)    willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

75.    In or in connection with an order to make, or the making of, a contract of sale of a commodity in interstate commerce or for future delivery that is made,

or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person, Defendants:

> a.  Knowingly or recklessly cheated or defrauded, or attempted to cheat or defraud pool participants by, among other things, making material misrepresentations and omissions regarding Defendants' trading performance and the security of the pool participants' contributions; and
>
> b.  Willfully made or caused to be made, false reports or statements to pool participants; and/or
>
> c.  Willfully deceived or attempted to deceive pool participants by, among other things, making material misrepresentations and omissions regarding Defendants' trading performance and the security of pool participants' contributions.

76.    By reason of the foregoing, Defendants violated 7 U.S.C. § 6b(a)(1)(A)-(C).

77.    The foregoing acts, omissions, and failures occurred within the scope of Mack and Mitchell's employment or office with YPIG. Therefore, YPIG is liable for their acts, omissions, and failures in violation of 7 U.S.C. § 6b(a)(1)(A)-(C), pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. §2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2024).

78.     Defendants Mack and Mitchell, directly or indirectly, controlled YPIG and did not act in good faith, or knowingly induced, directly or indirectly, YPIG's conduct alleged in this count.  Therefore, under Section 13(b) of the Act, 7 U.S.C. § 13c(b), Mack and Mitchell are liable for YPIG's violations of 7 U.S.C. § 6b(a)(1)(A)-(C).

79.     Each fraudulent or deceptive act, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(1)(A)-(C).

## COUNT TWO – AGAINST ALL DEFENDANTS

### Violations of Section 4*o*(1)(A)-(B) of the Act, 7 U.S.C. § 6*o*(1)(A)-(B)
### (Fraud by a CPO and an Associated Person of a CPO)

80.     Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

81.     7 U.S.C. § 6*o*(1) makes it unlawful for CPOs and APs of CPOs

[B]y use of the mails or any other means or instrumentality of interstate commerce, directly or indirectly—(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

82.     As alleged herein, during the Relevant Period, YPIG, through Mack and Mitchell, acted as a CPO by operating, soliciting and accepting funds for a commodity pool for the purpose of trading commodity interests.

20

83.     Mack and Mitchell acted as APs of a CPO by associating with YPIG, a CPO, as a partner, officer, employee, consultant, or agent in a capacity which involved the solicitation of funds, securities, or property for participation in a commodity pool.

84.     YPIG, through Mack and Mitchell, and Mack and Mitchell in their individual capacities, violated 7 U.S.C. § 6$o$(1)(A)-(B), in that by use of the mails in sending checks of purported profits to pool participants, and other means or instrumentality of interstate commerce including emailing pool participants fraudulent trading documents, they employed or are employing a device, scheme, or artifice to defraud actual or prospective pool participants, or engaged or are engaging in transactions, practices, or a course of business which operated or operates as a fraud or deceit upon actual or prospective pool participants.

85.     During the Relevant Period, Defendants violated 7 U.S.C. § 6$o$(1)(A)-(B), by, among other things:

- Falsely claiming to pool participants that Mitchell and Mack ran a profitable commodity pool;

- Falsely claiming to pool participants that their initial pool contribution was protected from losses by a guarantee fund;

- Issuing false written account statements to pool participants; and

- Using Pool Participants' funds to pay other pool participants in

the nature of a Ponzi scheme.

86.    Mack and Mitchell directly or indirectly control YPIG, and did not act in good faith or knowingly induced, directly or indirectly, YPIG's violations alleged in this Count, and are thus liable for YPIG's violations pursuant to 7 U.S.C. § 13c(b).

87.    The foregoing acts, omissions and failures of Mack and Mitchell as alleged in this Count, occurred within the scope of their employment, office or agency with YPIG: therefore, YPIG is liable for these acts, omissions and failures pursuant to 7 U.S.C. § 2(a)(1)(B) and Regulation 1.2.

88.    Each misrepresentation and omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A)-(B).

## COUNT THREE – AGAINST ALL DEFENDANTS

### Violations of Section 4m(1) of the Act, 7 U.S.C. 6m(1)
### (Failure to Register as a CPO)

89.    Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

90.    7 U.S.C. §6m(1) makes it unlawful for any CPO, unless registered with the CFTC, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

91.    During the Relevant Period, YPIG acted as a CPO and made use of

the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO by engaging in a business that is of the nature of a commodity pool, and, in connection therewith, soliciting, accepting and/or receiving funds from others for a pooled investment vehicle that engages in commodity futures transactions. YPIG engaged in this conduct without being registered with the Commission as a CPO in violation of 7 U.S.C. §6m(1). In the event that YPIG was eligible for an exemption from registration under Commission regulations, YPIG failed to claim such exemption from registration with the National Futures Association.

92.     Mack and Mitchell directly or indirectly controlled YPIG, and did not act in good faith or knowingly induced, directly or indirectly, YPIG's violations alleged in this Count, and are thus liable for its violations pursuant to 7 U.S.C. § 13c(b).

## COUNT FOUR – AGAINST ALL DEFENDANTS

**Violations of Section 4k(2) of the Act, 7 U.S.C. § 6k(2), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2024)**
**(Failure to Register as an AP of a CPO)**

93.     Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

94.     Section 4k(2) of the Act, 7 U.S.C. §6k(2) and Regulation 3.12(a), 17 C.F.R. §3.12(a) (2024), require any person associated with a CPO as a partner,

officer, employee, consultant or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves the solicitation, of funds, securities, or property for participation in a commodity pool to be registered as an AP of a CPO.

95.    During the Relevant Period, Defendants Mack and Mitchell acted as associated persons of a CPO by soliciting funds, securities, or property for the YPIG commodity pool. Mack and Mitchell engaged in this conduct without being registered with the Commission as an AP of CPO YPIG, in violation of 7 U.S.C. § 6k(2) and 17 C.F.R. § 3.12(a).

96.    During the Relevant Period, Defendant YPIG knew or should have known that Mack and Mitchell were not registered with the Commission as an associated person of YPIG, and yet allowed Mack and Mitchell to become or remain associated with YPIG as a partner, officer, employee and/or agent in a capacity that involved the solicitation of funds, securities or property for a participation in a commodity pool in violation of 7 U.S.C. § 6k(2).

97.    The foregoing acts, omissions and failures of Mack and Mitchell as alleged in this Count, occurred within the scope of their employment, office or agency with YPIG; therefore, YPIG is liable for these acts, omissions and failures pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.3.12R. § 1.2.

## COUNT FIVE – AGAINST ALL DEFENDANTS

**Violations of Regulation 4.20(a)(1), (b), (c), 17 C.F.R. § 4.20(a)(1), (b), (c) (2024)**
**(Failure to Operate Commodity Pool as a Separate Legal Entity, Failure to Receive Funds in the Pool's Name, and Commingling of Pool Funds)**

98.    Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

99.    17 C.F.R. § 4.20(a)(1) provides that a CPO, whether registered or not, must operate its commodity pool as a legal entity separate from that of the CPO.

100.   17 C.F.R. § 4.20(b) prohibits a CPO, whether registered or not, from receiving pool funds in any name other than that of the pool.

101.   17 C.F.R. § 4.20(c) prohibits a CPO, whether registered or not, from comingling the property of any pool it operates with the property of any other person.

102.   During the Relevant Period, Defendant YPIG, while acting as an unregistered CPO, violated 17 C.F.R. § 4.20(a)(1), (b) and (c) by: (i) failing to operate the Pool as a legal entity separate from Mack and Mitchell; (ii) failing to receive all pool participant funds in the Pool's name; and (iii) commingling pool participant funds with non-Pool assets when it deposited Pool funds into Mack and Mitchell's personal accounts.

103.   Each act of failing to operate the Pool as a legal entity separate from that of the CPO, improperly receiving pool participant funds, and commingling

Pool assets with non-Pool assets, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1), (b), and/or (c).

104.   Mack and Mitchell directly or indirectly controlled YPIG, and did not act in good faith or knowingly induced, directly or indirectly, YPIG's violations alleged in this Count, and are thus liable for YPIG's violations pursuant to 7 U.S.C. § 13c(b).

## COUNT SIX – AGAINST DEFENDANT MITCHELL

### Violation of the Commission's Order

105.   Paragraphs 1 through 72 are re-alleged and incorporated herein by reference.

106.   On September 22, 2021, the Commission entered the 2021 Order, which required Mitchell to cease and desist from violating Section 4m(l) of the Act, 7 U.S.C. § 6m(l) (2018), imposed a civil monetary penalty of $150,000 and prohibited Mitchell from, for a period of three years, directly or indirectly, engaging in trading on or subject to the rules of any registered entity or apply for registration, claiming exemption from registration or engaging in any activity requiring registration.

107.   The 2021 Order was entered under the Commission's authority pursuant to 6(c) and (d) of the Act, 7 U.S.C. §§ 9(4), 13b and Mitchell consented to

the use of the findings and conclusions in the 2021 Order in any other proceeding brought by the Commission.  Mitchell further agreed that the findings and conclusions of the 2021 Order "shall be taken as true and correct and be given preclusive effect therein, without further proof."

108.   Following the entry of the 2021 Order and during the Relevant Period, Mitchell violated the 2021 Order by engaging in the conduct described in paragraphs 1 through 72 above.  Mitchell failed to register as an AP of YPIG in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2), and Regulation 3.12(a), 17 C.F.R. § 3.12(a) (2024).  Also, Mitchell, as a controlling person of YPIG, is liable for YPIG's failure to register as a CPO in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1).

109.   Each violation of the Commission's 2021 Order, including but not limited to those specifically alleged herein, constitutes a separate and distinct violation of the 2021 Order.

## VI.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the CEA, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers enter:

A.    Enter an order finding that Defendants Mack, Mitchell and YPIG violated Sections 4b(a)(1)(A)-(C), 4k(2), 4m(1), and 4*o*(1)(A)-(B) of the Act, 7

U.S.C. §§ 6b(a)(1)(A)-(C), 6k(2), 6m(1), 6*o*(1)(A)-(B), and Regulations 3.12(a), and 4.20(a)(1), (b) and (c), 17 C.F.R. §§ 3.12(a), and 4.20(a)(1), (b) and (c) (2024).

B.    Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants Mack, Mitchell and YPIG, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons or entities in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6*o*(1)(A)-(B), 6k(2), and 6m(1), and 17 C.F.R. §§ 3.12(a), and 4.20(a)(1), (b) and (c);

C.    Enter an order finding that Defendant Mitchell violated the Commission's 2021 Order;

D.    Enter an order of permanent injunction restraining, enjoining and prohibiting Defendants Mack, Mitchell and YPIG, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons or entities in active concert with them, who receive actual notice of such order by personal service or otherwise, from, directly or indirectly:

      1.  Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

      2.  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2024)), for

accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3.  Having any commodity interests traded on any Defendants' behalf;

4.  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5.  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6.  Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2024); and

7.  Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. §3.1(a) (2024)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9).

E.  Enter an order requiring Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as

the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment interest thereon from the date of such violations, plus post-judgment interest.

F.    Enter an order requiring Defendants, as well as any successors thereof, to make full restitution, pursuant to such procedure as the Court may order, to every person or entity who sustained losses proximately caused by Defendants' violations, including pre-judgment and post-judgment interest.

G.    Enter an order directing Defendants and any of their successors, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Defendants and any of the clients whose funds were received by them as a result of the acts and practices which constituted violations of the Act and Regulations as described herein.

H.    Enter an order requiring each Defendant to pay a civil monetary penalty under the Act, to be assessed by the Court, in an amount not to exceed the penalty described by Section 6c(d)(1) of the Act, 7 U.S.C. §13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, Tit. VII, §701, 129 Stat. 584,

599-600, *see* Regulation 143.8, 17 C.F.R. §143.8 (2024), as amended 89 Fed.

Reg. 4544 (Jan. 24 , 2024), for each violation of the Act and Regulations, as

described herein.

     I.     Enter an order requiring Defendants to pay costs and fees as permitted

by 28 U.S.C. §§ 1920 and 2413(a)(2).

     J.     Enter an order providing such other and further relief as this Court

may deem necessary and appropriate under the circumstances.

## VII.     JURY DEMAND

   Plaintiff hereby demands a trial by jury.

Dated:  November 21, 2025       Respectfully submitted by,

                           */s/ Jason Gizzarelli*
                           Jason Gizzarelli
                           Commodity Futures Trading Commission
                           1155 21st Street, NW
                           Washington, DC 20581
                           Telephone: (202) 418-5395
                           jgizzarelli@cftc.gov
                           VA State Bar No. 42791

                           Karen Kenmotsu
                           Commodity Futures Trading Commission
                           1155 21st Street, NW
                           Washington, DC 20581
                           Telephone: (202)875-9587
                           kkenmotsu@cftc.gov
                           NY State Bar No. 2599306
                           NJ State Bar No. 057131993

Traci Rodriguez
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
Telephone: (202) 418-5980
trodriguez@cftc.gov
MD State Bar No. 0012130174

Paul G. Hayeck
Acting Director, Division of Enforcement
Commodity Futures Trading Commission
1155 21st Street, NW
Washington, DC 20581
Telephone: (202) 418-5312
phayeck@cftc.gov
MA Bar No. 554815

**ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION**

Counsel to Receive Notice:

Kevin Erskine (P69120)
Assistant U.S. Attorney
United States Attorney's Office
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
(313) 226-9610
Email: kevin.erskine@usdoj.gov